IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SONEET R. KAPILA, as Assignee, | : | CASE NO. |
| | : | |
| Plaintiff, | : | |
| vs. | : | |
| | : | |
| GEORGE B. ERENSEN, | : | |
| | : | |
| Defendant. | : | |

_____/

## COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Plaintiff, Soneet R. Kapila, in his capacity as the Assignee ("**Plaintiff**" and/or "**Assignee**") of Laser Spine Institute, LLC ("**LSI**") and each of its affiliated entities[1] (collectively, the "**Companies**") in the LSI Assignment Case (as defined below) sues George B. Erensen ("**Defendant**"), and alleges:

## PRELIMINARY STATEMENT

1.     This is a case of shameless corporate looting and abuse of authority which substantially benefitted the Defendant as the recipient and successor transferee of a fraudulent transfer that was initially made by the Companies to EFO Laser Spine Institute, Ltd. ("**EFO LSI**") in the amount of $41,822,592 (as well as several others totaling approximately $110 million). At or about the time EFO LSI received that initial fraudulent transfer from the Companies, EFO LSI made a subsequent fraudulent transfer of a portion of such funds to Defendant in the amount of $117,949.  Plaintiff seeks to recover that subsequent fraudulent transfer from the Defendant herein.

---

[1] The Plaintiff also acts as statutory assignee for the benefit of creditors for CLM Aviation, LLC, LSI Holdco, LLC ("Holdco"), LSI Management Company, LLC ("LSI Management"), Laser Spine Surgery Center of Arizona, LLC, Laser Spine Surgery Center of Cincinnati, LLC, Laser Spine Surgery Center Of Cleveland, LLC, Laser Spine Surgical Center, LLC, Laser Spine Surgery Center Of Pennsylvania, LLC, Laser Spine Surgery Center of St. Louis, LLC, Laser Spine Surgery Center Of Warwick, LLC, Medical Care Management Services, LLC, Spine DME Solutions, LLLC, Total Spine Care, LLC, Laser Spine Institute Consulting, LLC, and Laser Spine Surgery Center of Oklahoma, LLC.

2.      In July 2015, the members of management for the Companies caused the Companies to make approximately $110 million in initial fraudulent transfers, which fraudulent transfers stripped the Companies of their value, thereby causing the Companies to become immediately insolvent as a result of their then existing substantial liabilities in order to enrich the members of management and their affiliates, including EFO LSI and the Defendant.

3.      Through this scheme of corporate looting, and the equally-brazen, yet failed, attempt to insulate themselves from liability for their acts and omissions, the members of the Companies' management have thoroughly ransacked the Companies in a sweeping and now transparent plan to "take money off the table" for themselves and their affiliates, including EFO LSI and the Defendant, and leave its swollen liabilities behind.  Defendant, as a subsequent transferee from the initial transferee, EFO LSI, was the beneficiary of the fraudulent transfers made in the first instance from the Companies to EFO LSI.

4.      In the context of all of the acts and omissions set forth above and on the dates set forth on **Exhibit A** attached hereto, Holdco transferred to EFO LSI an amount equal to $41,822,592 (the "**Holdco Transfers**").  EFO LSI then made a subsequent transfer of a portion of the Holdco Transfers in the amount of $117,949 to Defendant as set forth on **Exhibit B** (the "**Subsequent Holdco Transfers**"). The Subsequent Holdco Transfers are avoidable and recoverable by the Plaintiff under Florida Statutes §§726.105, 726.108, and applicable law, including Delaware law (6 Del. C. § 1301 *et. seq.*). Plaintiff has initiated this litigation within one year from when the Assignee discovered or reasonably could have discovered the Subsequent Holdco Transfers.

5.      In addition and in the alternative, LSI Management fraudulently transferred the amounts of the Holdco Transfers first to Holdco as a conduit and then to EFO LSI ("**LSI**

**Management Transfers**") (sometimes hereinafter, Holdco Transfers and LSI Management Transfers shall be referred to as the "**Transfers**").  EFO LSI then made a subsequent transfer of a portion of the LSI Management Transfers (through Holdco as a conduit) in the amount of $117,949 to Defendant as set forth on Exhibit B hereto (the "**Subsequent LSI Management Transfers**") (sometimes hereinafter, Subsequent Holdco Transfers and Subsequent LSI Management Transfers, being in the same amount and representing the same transfers, shall be referred to as the "**Subsequent Transfers**"). The Subsequent LSI Management Transfers are avoidable and recoverable by the Plaintiff under Florida Statutes §§ 726.105, 726.016, 726.108 and applicable law, including Delaware law (6 Del. C. § 1301 *et. seq.*).  Plaintiff has initiated this litigation within one year of when the Assignee discovered or reasonably could have discovered the Subsequent LSI Management Transfers.

6.       Specifically, unbeknownst to the Plaintiff until recently, EFO LSI made the Subsequent Transfers to Defendant, which Subsequent Transfers are directly traceable to the Holdco Transfers and LSI Management Transfers as they were made to Defendant almost immediately after EFO LSI received such Holdco Transfers and LSI Management Transfers.

7.       Specifically, unbeknownst to the Plaintiff until recently, EFO LSI made the Subsequent Transfers to Defendant, which Subsequent Transfers are directly traceable to the Holdco Transfers and LSI Management Transfers as they were made to Defendant almost immediately after EFO LSI received such Holdco Transfers and LSI Management Transfers.

8.       On or about March 13, 2020, Plaintiffs first became aware of the subsequent transfers by EFO LSI to Defendant.

9.     EFO LSI made the Subsequent Transfers to the Defendant and certain other of its partners in furtherance of the Wrongful Acts (defined below) and thereby furthered the Companies' efforts to hinder and/or delay its creditors.

10.     Further, although the Plaintiff is the statutory assignee of the Companies, the Plaintiff is not, and has never been, the statutory assignee of EFO LSI and did not have access to information pertaining to either the ownership structure of EFO LSI, or the partners of EFO LSI, or the recipients of distributions (including the Subsequent Transfers).

11.     In the absence of the facts and information, the Assignee could not have reasonably discovered, the Subsequent Transfers (and the recipients thereof).

## PARTIES, JURISDICTION, AND VENUE

12.     Plaintiff is the duly-appointed and acting statutory Assignee for the benefit of creditors of the Companies and has legal standing and authority to prosecute the claims set forth herein.

13.     On March 14, 2019, LSI executed and delivered an assignment for the benefit of creditors to the Assignee. The Assignee filed a Petition with Circuit Court for the Thirteenth Judicial Circuit in and For Hillsborough County, Florida, on March 14, 2019, commencing an assignment for the benefit of creditors proceeding pursuant to Section 727 of the Florida Statutes under Consolidated Case No. 2019-CA-2762 (the "**LSI Assignment Case**").

14.     Simultaneous with the filing of the LSI Assignment Case, the Assignee filed fifteen other Petitions commencing an assignment for the benefit of creditors proceeding for each of 15 companies (the "**Assignment Cases**"): LSI Management; CLM Aviation, LLC; Holdco; Laser Spine Surgery Center of Arizona, LLC; Laser Spine Surgery Center of Cincinnati, LLC; Laser Spine Surgery Center Of Cleveland, LLC; Laser Spine Surgical Center, LLC; Laser Spine Surgery

Center Of Pennsylvania, LLC; Laser Spine Surgery Center of St. Louis, LLC; Laser Spine Surgery Center Of Warwick, LLC; Medical Care Management Services, LLC; Spine DME Solutions, LLLC; Total Spine Care, LLC; Laser Spine Institute Consulting, LLC; and Laser Spine Surgery Center of Oklahoma, LLC.

15.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332, in that: (a) this is an action between a citizen of Connecticut and a citizen of the State of Florida; and (b) the amount in controversy herein exceeds $75,000.00, exclusive of interest, costs, and attorneys' fees.

16.    Plaintiff is a resident of Florida.

17.    Upon information and belief, Defendant is a resident of Connecticut.

18.    All conditions precedent to the filing of this action have been performed, waived, satisfied or have occurred.

## FACTS COMMON TO ALL COUNTS

A.    **Formation and Management of LSI, LSI Management and the Companies.**

19.    In 2005, LSI was formed as a limited liability company organized under the laws of the State of Florida. In 2009, LSI Management was formed as a limited liability company also organized under the laws of the State of Florida.

20.    LSI opened its first surgical facility in Tampa, Florida. At that time, it operated as a single-operating room facility focused on spine related orthopedic procedures.

21.    During the succeeding years, LSI, as the parent company, formed a number of wholly-owned subsidiaries and began to open additional surgical facilities around the country, including Scottsdale, Arizona (in 2008), Philadelphia, Pennsylvania (in 2009), Oklahoma City,

Oklahoma (in 2011), Cleveland, Ohio (in 2014), St. Louis, Missouri (in 2015) and Cincinnati, Ohio (in 2015).

22.     At its peak, LSI became a national spine-focused, orthopedic chain performing about 100,000 procedures in facilities in five different states and employing more than 600 individuals.

23.     From its inception through early 2015, LSI was by all measures a successful business operation, generating gross revenues in 2010 of approximately $115 million, which revenues increased year over year through 2014 to approximately $268 million. Similarly, LSI's EBITDA increased from approximately $24 million in 2010 to approximately $77 million in 2014. During these years, the members/owners of LSI—including EFO LSI—received substantial distributions on their membership interests.

24.     Notwithstanding its apparent success through 2014, the Companies were facing a number of problems, including financial issues and substantial exposure to damages from a number of lawsuits that had been filed against the Companies.

**B.      The Bailey Litigation.**

25.     One such litigation was filed in 2006 by Dr. Joe Samuel Bailey and his related entities (the "**Bailey Litigation**"), including Laserscopic Spinal Centers of America, Inc. (collectively, "**LSE**"). In the Bailey Litigation, LSE asserted claims against some of the Companies and others for breach of fiduciary duty, defamation, slander per se, FDUPTA violations, conspiracy and tortious interference.

26.     The Bailey Litigation proceeded to a bench trial in the Circuit Court of the Thirteenth Judicial Circuit in and for Hillsborough County, Florida (the "**Court**") on the following dates: July 12-23, 2010; September 20-28, 2010; April 29, 2011 and May 9-20, 2011. On October

9, 2012, the Court issued a 131-page memorandum opinion. On November 2, 2012, the Court entered a Final Judgment in favor of the LSE as plaintiff, awarding damages of $1.6 million (the "**Original Judgment**").  Thereafter, both sides appealed.

27.     Upon information and belief, the Companies recognized that the Bailey Litigation was and would be a significant loss for the Companies that could have potentially catastrophic financial ramifications.

28.     On February 3, 2016, the Second District Court of Appeals (the "**Second DCA**") issued an opinion reversing the Original Judgment and determined that: (1) LSE could obtain a disgorgement of the Companies' profits irrespective of the amount of LSE's actual damages or whether it suffered any financial loss, (2) the Court's factual findings supported an award of punitive damages, and (3) damages should be awarded for the FDUPTA violations because monetary relief could be awarded to business enterprises in addition to consumers. The Second DCA remanded the case back to the trial court and noted, among other things, that the evidence supported an award of out-of-pocket damages of $6,831,172 and disgorgement damages in the neighborhood of $271 million.

29.     On remand, the Court entered an Amended Final Judgment on January 30, 2017, adding an award of punitive damages in the amount of $5,750,000, a FDUPTA damage award of $1,050,000, and confirming the prior damages award of $1.6 million.

30.     Another appeal ensued and the Second DCA reversed and remanded again, directing the Court to award out-of-pocket damages of $6,831,172 and holding that the disgorgement damages "at a minimum" are between $264 million to $265 million.

C.    **Holdco Gains Control of LSI and LSI Management.**

31.    The Companies' management did not *just* use their control over LSI, LSI Management, and the Companies to loot them of millions of dollars in cash after they had fallen on hard times and became insolvent.  They did not *just* grossly enrich themselves to the detriment of LSI, LSI Management, and the Companies at a time when such Companies were insolvent or became insolvent as a result of approximately $110 million in fraudulent transfers in July 2015. Indeed, following the Original Judgment, the managers of LSI, LSI Management, and the Companies concocted a (failed) scheme to insulate themselves from liability.

32.    A component of this cover-up was the attempted restructuring of the Companies following the Original Judgment.

33.    In December of 2012, which was approximately one month after the Court entered the Original Judgment in the Bailey Litigation against LSI, among others, the Board of Managers caused Holdco to be formed under Delaware law as the  new holding company to replace LSI in that capacity.

34.    On January 1, 2013, the members of LSI, which was the then-existing holding company, entered into a new operating agreement with Holdco and, among other things, transferred all of their membership interests in LSI to Holdco (the "**2013 LSI Operating Agreement**"), making Holdco the sole member and managing member of LSI.  Essentially, the owners of LSI each assigned their interests in LSI to Holdco in exchange for equivalent membership interests in Holdco.  As a result of this assignment, Holdco became the sole member and owner of LSI and LSI Management.

35. Under the 2013 LSI Operating Agreement, and as sole member of LSI, Holdco managed, conducted, and controlled the affairs of LSI, and controlled the assets of LSI and the assets of LSI's subsidiaries.

36. Similarly, in 2013, the members of LSI Management entered into a new operating agreement which, among other things, named Holdco as LSI Management's sole member and managing member.

37. From and after January 1, 2013, Holdco became the parent holding company and was the sole manager of LSI and the direct and indirect sole manager of the remainder of the Companies. At this time, EFO LSI owned the largest percentage of Holdco and, therefore, received the largest share of transfers from Holdco to its members, owners, and/or partners.

38. Holdco, in turn, was dominated by a cabal of managers that included representatives of EFO LSI and comprised a "Board of Managers" of Holdco. Indeed, from and after January 1, 2013, this "Board of Managers" was established at Holdco in order to manage Holdco and its subsidiaries—namely, the Companies.

39. Under Holdco's operating agreement, the business affairs of Holdco and its Company-subsidiaries were to be exercised by the members comprising this Board of Managers.

40. In fact, the members of the Board of Managers controlled all aspects of Holdco and its subsidiary Companies (including, LSI and LSI Management), including, among other things: the property of Holdco and its subsidiary Companies; the prosecution, assignment, transfer, and/or release of any cause of action available to Holdco or its subsidiary Companies; the distributions of monies from Holdco and its subsidiary Companies to the members of Holdco.; the procurement of financing on behalf of Holdco and its subsidiary Companies; and the filing of any bankruptcy or other action by Holdco or its subsidiary Companies seeking protection from creditors.

41.     Thus, since January 1, 2013, Holdco's Board of Managers controlled the complex web of subsidiary Companies (including LSI and LSI Management) that, at that time, comprised the above-referenced national spine-focused, orthopedic chain of facilities that performed about 100,000 procedures in five different states and employed, at one time, more than 600 individuals.

42.     Indeed, at all times material to this Complaint, the above corporate restructuring of Holdco simply added a layer of corporate fiction between the Board of Managers, on the one hand, and LSI and LSI Management (as well as the other Companies) on the other hand.  To be clear, despite the corporate restructuring of Holdco, the members of the Board of Managers continued to have and continued to exercise complete and full dominion and control over LSI and LSI Management (as well as the other subsidiary Companies), their day-to-day affairs and operations, and their respective property.

43.     At bottom, after this so-called restructuring, the managers of Holdco exercised full dominion and control over Holdco, which in turn exercised full dominion and control over LSI and LSI Management (as well as the other Companies).

44.     As outlined below, the members of the Board of Managers used their control over LSI and LSI Management (among other Companies) and took action with actual intent to hinder and delay creditors of the Companies to divert substantial  value from LSI and LSI Management in the form of $110 million in fraudulent transfers for their own benefit or the benefit of their direct and indirect affiliates, all to the severe detriment of LSI, LSI Management, and the rest of the Companies at a time when such Companies were or became insolvent as a result thereof.

**D.     The Dividend Recapitalization, Insolvency, Defaults and Financial Mismanagement.**

45.     The Companies were experiencing serious deficiencies in and failures of internal controls and accounting procedures leading up to and during 2015.

46.     Primarily, LSI needed to write-down approximately $34 million of accounts receivable for fiscal year 2015 and it had to establish a reserve for bad debt of approximately $22.5 million for fiscal year 2015. These write downs and reserves required LSI to restate its financial results for fiscal year 2015.  Specifically, LSI's revenue for 2015 was reduced from $322 million to $263.5 million and its EBITDA was reduced from $74.6 million to $16.1 million for the twelve-month period ending December 31, 2015.

47.      LSI later admitted that it had a "dire need of immediate liquidity" in 2015, and that it was facing serious financial issues.

48.     After the significant loss in the Bailey Litigation, in 2014, the members of the Holdco Board of Managers entertained offers from third parties to purchase equity in the Companies.

49.     Ultimately, rather than sell the equity in LSI, LSI Management, and the other Companies, EFO LSI's principals and the other members of the Board of Managers elected to enrich themselves by looting the value of LSI, LSI Management, and the Companies through a dividend loan transaction.

50.     In fact, according to an internal e-mail from one of the managers to several of the other managers in December 2015, the "*Board decided that our company was too special to sell. Because several members of the Board wanted to 'take some money off the table' we decided to put some debt on the company through a dividend recap instead of selling a piece of the business.*"

51.     To that end, in the early part of 2015 and despite the existing and impending financial issues facing the Companies, the Companies approached Texas Capital Bank, who was their then existing senior secured lender, and proposed to borrow a substantial amount of money

in order to make dividend/distribution payments to the owners/members of Holdco, including EFO LSI.

52.     Through the dividend recapitalization loan among the Companies and Texas Capital Bank, the Board of Managers leveraged the assets of the Companies for their own personal advantage (and those related to them) and to the severe financial disadvantage of the Companies.

53.     Thereafter, on or about July 2, 2015, the Board of Managers caused certain of the Companies—namely, LSI, LSI Management, Laser Spine Institute Consulting, LLC and Medical Care Management Services, LLC (collectively, the "**LSI Borrowers**")—to enter into a $150,000,000 credit agreement (the "**Dividend Loan**") with Texas Capital Bank (the "**Lender**"). The obligations under the Dividend Loan were guaranteed by Holdco and the remainder of the Companies.

54.     In connection with the Dividend Loan, the Companies agreed, among other things, to: (a) maintain certain financial covenants; (b) maintain certain cash balances; and (c) maintain its primary depository, purchasing and treasury services with the Lender.

55.     The members of the Board of Managers caused substantially all of the Companies' assets to be pledged to the Lender to secure and serve as collateral for the Dividend Loan.  The bulk of the proceeds from the Dividend Loan was deposited by the Lender into the bank account of LSI Management.

56.     Despite facing existing and impending financial issues, the members of the Board of Managers immediately authorized and ratified the transfer from LSI Management to Holdco of an amount equal to $110,473,942 of the proceeds of the Dividend Loan and simultaneously therewith caused, authorized and ratified the almost immediate transfer by Holdco of all of such

monies to the other members of the Board of Managers, other ultimate equity holders/members of the Companies and their affiliates, including to EFO LSI (the "**Dividend Distributions**").

57.     As set forth above, unbeknownst to the Plaintiff, who could not have reasonably discovered these transactions until after March 13, 2020, EFO LSI, in 2015, made the Subsequent Transfers to the Defendant after receiving its share of the Dividend Distributions outlined above.

58.     As a direct result of the Dividend Distributions, each of Holdco, LSI, LSI Management, and the other Companies each became insolvent.

59.     Predictably, the financial viability of LSI, LSI Management, and the other Companies deteriorated rapidly thereafter, as shortly after the Dividend Distributions were made, the Companies were unable to meet their obligations under the Dividend Loan.

60.     Barely one year later, by at least the middle of 2016, the Companies defaulted under the Dividend Loan. On May 26, 2016 and June 9, 2016, the Lender issued notices of default to the LSI Borrowers.

61.     Later, in June 2016, the Companies' deteriorating financial condition caused them to lay off 70 employees, which was about 6% of their workforce.

62.     In addition, in 2016, the Companies failed to make approximately $7.7 million in payments due to the landlord for the Companies' Tampa facility.

**E.     The Failure to Pursue Recoveries Regarding the Dividend Distributions, and Election to Protect Self-Interests to the Detriment of the Companies.**

63.     By at least November 2016 and at a time when the Companies were insolvent and experiencing financial distress, the Board of Managers, among others, was aware that certain claims and causes of action existed in favor of the Companies to recover the Dividend Distributions from the recipients thereof.

64.     Consistent with the deliberate mishandling (and leveraging) by the members of the Board of Managers of the Companies' assets, and their concomitant disregard of their fiduciary duties to the Companies, the members of the Board of Managers accountable refused to hold EFO LSI and others (including, for example, the Defendant as a subsequent transferee of the Transfers and recipient of the Subsequent Transfers) accountable for the fraudulent transfers derived from the Dividend Loan and Dividend Distributions.

65.     The Board of Managers and others knew or should have known that the Dividend Distributions violated applicable law in that they were fraudulent transfers and that the recipients thereof would be liable to repay for the Dividend Distributions as a result.  Despite having the ability and responsibility, as *de facto* managers, members, and/or members of the Board of Managers and for the Companies, to cause the Companies to take appropriate action to timely and fully recover the Dividend Distributions, the Board of Managers and others failed to do so.

66.     As a result, and at a time when the Companies' financial condition should have been of paramount importance, the members of the Board of Managers drained the Companies of cash through the Dividend Distributions, caused the Companies to become insolvent, and refused to take action to recover the value of the Dividend Distributions to ameliorate these dire financial issues.

67.     These financial problems severely impacted the Companies' prospects as going concerns, ultimately resulting in the Companies further defaults under the Dividend Loan and ultimate collapse.

68.     The members of the Board of Managers failed to pursue the claims and/or causes of action to recover the Dividend Distributions because the members of the Board of Managers

and those affiliated with them were recipients of the Dividend Distributions and, therefore, were hopelessly conflicted in respect of pursuing such claims.

69.     The failure to take such action is evidence of the actual intent of the Companies (through the Board of Managers) to hinder and delay the creditors of the Companies when the Transfers and Subsequent Transfers were first made.

**F.     The Failed Cover-Up.**

70.     Hoping for a clean escape, the Board of Managers and others not only failed to pursue the Companies' claims against EFO LSI (and subsequent transferees of EFO LSI, like the Defendant) for recovery of the Dividend Distributions; rather, they also attempted to protect and insulate themselves from any claims related thereto in at least two ways.  First, they sought releases from the Lender in connection with the Dividend Loan.  Second, they also sought to distance themselves from such willful failures by manipulating the corporate structure of the Companies.

71.     Importantly, each act and/or omission by the members of the Board of Managers after the Dividend Loan and Dividend Distributions to insulate themselves from liability and cover up their breaches of fiduciary duty bears on and evidences the fact that the Companies, through the Board of Managers, actually intended to hinder and/or delay the creditors of the Companies through the Dividend Distributions, including the Transfers to EFO LSI and the Subsequent Transfers to Defendant.

**G.     The Fraudulent Transfers.**

72.     Holdco and LSI Management engaged in a series of fraudulent transfers in respect of the Dividend Distributions of in excess of $110 million that are all avoidable and recoverable by Plaintiff under Chapter 726 of the Florida Statutes or under other applicable law, which transfers caused Holdco and LSI Management to become insolvent by tens of millions of dollars.

73.     Almost immediately after receiving the proceeds from the Dividend Loan, the members of the Board of Managers of Holdco caused LSI Management to transfer to Holdco, as a conduit, in excess of $110 million for the sole and express purpose of transferring such funds to Holdco's members, including EFO LSI.  On information and belief, the proceeds of the Dividend Loan were deposited initially into LSI Management because LSI Management was not a party to the Bailey Litigation or the judgments entered against LSI in the Bailey Litigation.

74.     Thereafter, the Board of Managers caused Holdco to make the Transfers to EFO LSI.

75.     EFO LSI received the Transfers set forth on Exhibit A attached hereto in the amounts set forth thereon. The Transfers constituted property of LSI Management, Holdco and those Companies that constituted the LSI Borrowers and those Companies that guaranteed the Dividend Loan.

76.     Neither LSI Management nor Holdco received any value, let alone any reasonably equivalent value, from EFO LSI in exchange for the Transfers.

77.     The Transfers were made by Holdco and by LSI Management with the actual intent to hinder and/or delay the creditors of Holdco, LSI Management and the rest of the Companies.

78.     At all relevant times herein, as a direct result of the Dividend Loan and Dividend Distributions, LSI Management, Holdco, and rest of the Companies became insolvent by tens of millions of dollars.

79.     At all relevant times herein, including at the time the Transfers were made, LSI Management, Holdco, and rest of the Companies were engaged in or were about to engage in a business or a transaction for which the remaining assets of LSI Management, Holdco., and the rest of the Companies were unreasonably small in relation to such business or transaction.

80.     At all relevant times herein, including at the time the Transfers were made, LSI Management, Holdco, and the rest of the Companies intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due.

81.     The Plaintiff sues the Defendant to avoid and recover the Subsequent Transfers pursuant to Fla. Stat. §726.101 *et seq.* ("**FUFTA**"), 6 Del. C. § 1301 *et seq*. ("**DUFTA**").

**COUNT I**
**AVOIDANCE AND RECOVERY OF THE SUBSEQUENT TRANSFERS  UNDER FLORIDA LAW—ACTUAL INTENT FRAUD**

82.     The Plaintiff re-alleges paragraphs 1 through 81as if fully set forth herein.

83.     In connection with the Dividend Loan and Dividend Distributions, LSI Management transferred monies, namely the LSI Management Transfers, to Holdco as a conduit for the sole and express purpose of transferring such monies to EFO LSI and others; and, Holdco transferred monies, namely the Holdco Transfers, to EFO LSI on the dates and in the amounts set forth on **Exhibit A**.

84.     Thereafter, EFO LSI transferred the Subsequent Transfers in the amount of $117,949 to the Defendant.  The Defendant did not take and/or receive the Subsequent Transfers in good faith, and did not take and/or receive the Subsequent Transfers for a reasonably equivalent value or for any value whatsoever.

85.     The LSI Management Transfers and the Holdco Transfers constitute transfers made by LSI Management and Holdco with the actual intent to hinder or delay creditors of LSI Management, Holdco, and the Companies.

86.     Pursuant to FUFTA, the Plaintiff may avoid any transfer of an interest of LSI Management in property that is voidable under applicable law by a creditor holding an unsecured claim.

87.     FUFTA provides that a transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation with actual intent to hinder, delay, or defraud any creditor of the debtor

88.     Further, under FUFTA, the Plaintiff may recover, for the benefit of the estate, the value of the property transferred from (1) the first transferee of such transfer or the entity for whose benefit such transfer was made; and (2) any subsequent transferee of such first transferee, including the Defendant.

89.     Before the LSI Management Transfers, the Companies were facing serious financial and liquidity issues.  The Dividend Distributions compounded and substantially worsened the Companies' financial condition in that the Companies had become obligated on the Dividend Loan (including by granting liens on all of their assets), yet approximately $110 million of the Dividend Loan was transferred directly and indirectly to the owners of the Companies and their affiliates (and subsequent transferees, including the Defendant), causing the Companies to become insolvent as a result. The Transfers occurred shortly after LSI Management, Holdco, and the Companies took on a substantial debt (the Dividend Loan).

90.     At the time of the LSI Management Transfers and the Holdco Transfers, LSI Management and Holdco had unsecured claims and were insolvent, had their insolvency deepened, or became insolvent as a result of such Transfers.

91.     As a result of the LSI Management Transfers and the Holdco Transfers, LSI Management, Holdco, and the Companies have been damaged and, pursuant to Fla. Stat., §§ 726.105(1)(a), 726.108 and 726.109.

92.     LSI Management fraudulently transferred the LSI Management Transfers to EFO LSI, utilizing Holdco as a conduit, and the Defendant is a subsequent transferee of such transfers (in the form of transfers from EFO LSI of a portion of the fraudulent transfers EFO LSI received from LSI Management).

93.     As alleged above, the Plaintiff did not discover the Subsequent Transfers—including the Subsequent LSI Management Transfers and the Subsequent Holdco Transfers—and could not have reasonably discovered the Subsequent Transfers until March 13, 2020.

94.     As a result, the Plaintiff is entitled to avoid and recover the Subsequent Transfers—including the LSI Management Subsequent Transfers and the Holdco Transfers—as voidable from Defendant as the subsequent transferee.

**WHEREFORE**, the Plaintiff demands judgment against the Defendant: (i) avoiding the Subsequent Transfers and recovering the amount of those transfers from Defendant; (ii) pre-judgment and post-judgment interest as allowed by law; and (iii) such other and further legal and equitable relief as the Court deems just and proper.

**COUNT II**
**AVOIDANCE AND RECOVERY OF THE SUBSEQUENT TRANSFERS  UNDER DELAWARE LAW—ACTUAL INTENT FRAUD**

95.     The Plaintiff re-alleges paragraphs 1 through 81 as if fully set forth herein.

96.     In connection with the Dividend Loan and Dividend Distributions, LSI Management transferred monies, namely the LSI Management Transfers, to Holdco as a conduit for the sole and express purpose of transferring such monies to EFO LSI and others; and, Holdco transferred monies, namely the Holdco Transfers, to EFO LSI on the dates and in the amounts set forth on **Exhibit A**.

97.     Thereafter, EFO LSI transferred the Subsequent Transfers in the amount of $117,949 to the Defendant. The Defendant did not take and/or receive the Subsequent Transfers in good faith, and did not take and/or receive the Subsequent Transfers for a reasonably equivalent value or for any value whatsoever.

98.     The LSI Management Transfers and the Holdco Transfers constitute transfers made by LSI Management and Holdco with the actual intent to hinder or delay creditors of LSI Management, Holdco, and the Companies.

99.     Pursuant to DUFTA, the Plaintiff may avoid any transfer of an interest of LSI Management in property that is voidable under applicable law by a creditor holding an unsecured claim.

100.     DUFTA provides that a transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation with actual intent to hinder, delay, or defraud any creditor of the debtor

101.     Further, under DUFTA, the Plaintiff may recover, for the benefit of the estate, the value of the property transferred from (1) the first transferee of such transfer or the entity for whose benefit such transfer was made; and (2) any subsequent transferee of such first transferee, including the Defendant.

102.     Before the Holdco Transfers, the Companies were facing serious financial and liquidity issues.  The Dividend Distributions compounded and substantially worsened the Companies' financial condition in that the Companies had become obligated on the Dividend Loan (including by granting liens on all of their assets), yet approximately $110 million of the Dividend Loan was transferred directly and indirectly to the owners of the Companies and their affiliates

(and subsequent transferees, including the Defendant), causing the Companies to become insolvent as a result

103.    The Transfers occurred shortly after LSI Management, Holdco, and the Companies took on a substantial debt (the Dividend Loan).

104.    At the time of the LSI Management Transfers and the Holdco Transfers, LSI Management and Holdco had unsecured claims and were insolvent, had their insolvency deepened, or became insolvent as a result of such Transfers.

105.    As a result of the LSI Management Transfers and the Holdco Transfers, LSI Management, Holdco, and the Companies have been damaged and, pursuant to DUFTA, may avoid and recover the Subsequent Transfers from Defendant.

106.    LSI Management fraudulently transferred the LSI Management Transfers to EFO LSI, utilizing Holdco as a conduit, and the Defendant is a subsequent transferee of such transfers (in the form of transfers from EFO LSI of a portion of the fraudulent transfers EFO LSI received from LSI Management).

107.    As alleged above, the Plaintiff did not discover the Subsequent Transfers—including the Subsequent LSI Management Transfers and the Subsequent Holdco Transfers—and could not have reasonably discovered the Subsequent Transfers until March 13, 2020.

108.    As a result, the Plaintiff is entitled to avoid and recover the Subsequent Transfers—including the LSI Management Subsequent Transfers and the Holdco Transfers—as voidable from Defendant as the subsequent transferee.

    **WHEREFORE**, the Plaintiff demands judgment against the Defendant: (i) avoiding the Subsequent Transfers and recovering the amount of those transfers from Defendant; (ii) pre-

judgment and post-judgment interest as allowed by law; and (iii) such other and further legal and equitable relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL AS TO ALL COUNTS OF THE AMENDED COMPLAINT

Plaintiff hereby demands a trial by jury on all claims, issues, and Counts of the Complaint triable by such.

## RESERVATION OF RIGHTS

The Plaintiff reserves the right to further amend this Complaint upon completion of his investigation and discovery in order to assert any additional claims for relief against the Defendant as may be warranted under the circumstances.

Dated this 12th day of March 2021.

FOR THE PLAINTIFF/ASSIGNEE

___/s/_Jennifer Tindall, Esq._____
Jennifer Tindall, ct23000
P.O. Box 223
Glastonbury, CT 06033
Tel : (860)205-0543
Fax: (860)736-2005
Email: tindalljc@gmail.com

GENOVESE JOBLOVE & BATTISTA, P.A.
*Co-Counsel for the Plaintiff/Assignee*
*To be admitted Pro-Hac Vice*
100 Southeast Second Street, Suite 4400
Miami, Florida 33131
Tel: (305) 349-2300
Fax: (305) 349-2310

By: /s/ Paul J. Battista, Esq._____
Paul J. Battista, Esq., FBN 884162
pbattista@gjb-law.com
Gregory M. Garno, Esq., FBN 087505
ggarno@gjb-law.com

ROCKE, McLEAN & SBAR, P.A.
*Co-Counsel for the Plaintiff/Assignee*
*To be admitted Pro-Hac Vice*
2309 S. MacDill Avenue
Tampa, Florida 33629
Tel:  813-769-5600
Fax: 813-769-5601

By: /s/ Robert L. Rocke, Esq._____
Robert L. Rocke, Esq., FBN 710342
rrocke@rmslegal.com
Jonathan B. Sbar, Esq., FBN 131016
jsbar@rmslegal.com
Raul Valles, Jr., Esq., FBN 148105
rvalles@rmslegal.com

Andrea K. Holder, Esq., FBN 104756
aholder@rmslegal.com

**EXHIBIT A**

### Laser Spine Institute ("LSI")

### EFO Laser Spine Institute, LTD. Distributions Paid from TCB Account No. 1719 After July 2015 Recap

| | Distribution 07/06/15 | Distribution 10/23/15 | Distribution 10/23/15 | Total Paid After Recap |
|---|---|---|---|---|
| EFO Laser Spine Institute, LTD. | 41,254,731 | 478,333 | 89,528 | $ 41,822,592 |

**EXHIBIT B**

## Laser Spine Institute ("LSI")

## George B. Erensen - Transfer from EFO Laser Spine Institute, LTD.

| | Transfer Amount |
|---|---|
| George B. Erensen | $ 117,949 |